Filed 12/24/20  In re P.V. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re P.V., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D077410 |
| Plaintiff and Respondent, | (Super. Ct. Nos. J519635, J519635C) |
| v. | |
| Kendra C. et al., | |
| Defendants and Appellants; | |
| Marie C., a minor, etc., et al., | |
| Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant Kendra C.

Elizbeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant Francisco V.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Appellants Marie C. and Athena V.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

This case involves a placement decision over two-year-old P.V. For most of her life, she has lived with caregivers Brian and Lisa C., who hoped to adopt her. P.V.'s out-of-state relatives were also prepared to adopt her. Meanwhile, P.V.'s sisters Marie C. and Athena V., ages four and three (siblings), lived with a different caregiver, who, likewise, wished to adopt P.V.

The siblings appeal an order denying a Welfare and Institutions Code section 388[1] petition that requested a change in P.V.'s placement from caregivers Brian and Lisa to the siblings' caregiver, Yvette. The siblings argue it is in P.V.'s best interest to be placed with them in Yvette's home.

P.V.'s mother, Kendra C. (Mother), joins siblings' argument and further appeals an order terminating her parental rights, contending the juvenile court erred in not applying the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)). P.V.'s father, Francisco V. (Father), joins in the siblings' and Mother's arguments on appeal.

We conclude the juvenile court did not err and, accordingly, affirm the orders.

---

1    Further unspecified statutory references are to the Welfare and Institutions Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

*Siblings' Removal from Parents and Placement with Yvette*

Siblings Marie and Athena were born in May 2016 and July 2017, respectively. In December 2017, the San Diego County Health and Human Services Agency (Agency) filed petitions on their behalf based on the parents' serious domestic violence and neglect, caused or exacerbated by Mother's mental illnesses. (§ 300, subds. (b) & (j).) The siblings were declared dependents, removed from parental custody, and placed with Yvette, a nonrelative extended family member.[2] Yvette had resource family approval (RFA) for the siblings.

In October 2018, the parents' reunification services were terminated because they had made minimal progress on their case plans. The Agency began permanency planning for the siblings.

*P.V.'s Case*

In mid-November 2018, Mother gave birth to P.V. Shortly after giving birth, an incident occurred at the hospital wherein Mother allegedly failed to feed P.V. for five hours and refused the assistance of hospital staff. That, combined with the parents' histories and untreated conditions, led quickly to the Agency's obtaining a protective custody warrant and filing a petition on P.V.'s behalf. (§ 300, subd. (b).) Newborn P.V. was detained with foster parent Dana.[3]

---

[2]    Yvette met Mother through a nonprofit organization that provides support services. Yvette is described as Marie and Athena's godmother and Mother's long-time mentor.

[3]    Although it was already contemplated that Yvette was a concurrent placement for P.V.'s siblings, Yvette informed the Agency that she was not

In December 2018, the Agency filed a jurisdiction/disposition report that included its placement considerations. At the time, Mother did not want P.V. placed with Yvette because she thought Yvette had made false statements, contributing to Mother's current predicament. Yvette was a single working mother caring for Athena, Marie, and her two biological children ages four and five, i.e., four children ranging from one to five years old. Yvette's friend, Kriss, had recently moved into Yvette's home to help care for all these children. Kriss wished to be considered for placement of P.V. Yvette, who only had RFA for the siblings, stated that she would consider placement of P.V. if Kriss was unable but would require assistance.

In a February 2019 addendum report, Mother had a better outlook on her relationship with Yvette but still noted Yvette had told her "more than once" that she could "barely" manage the four children already in her care. For this reason, Mother was hoping P.V. could be placed with Kriss while Kriss lived in Yvette's home. Around the same time, foster parent Dana gave notice that she could only be a short-term placement option for P.V. The Agency continued trying to find a concurrent home for P.V. and searching for relatives to serve as placement options.

In late February, the court made a true finding on the petition and assumed dependency jurisdiction over P.V. The court set out the disposition hearing to see whether the parents would take steps to treat the problems that led to the siblings' removal.

---

interested in providing a permanent home for P.V. because it would be "too much" for her as a "single mom."

On March 1, 2019, three-and-a-half month old P.V. was placed with caregivers Brian and Lisa, and thereafter, continuously resided with them.[4]

In mid-March, the Agency located and spoke to Mother's cousin, April (Cousin), who lived in Minnesota. Cousin had not kept in touch with Mother yet was interested in having all three children (P.V. plus siblings) placed with her and her husband. The assigned social worker began an out-of-state placement process under the Interstate Compact on Placement of Children (ICPC; Fam. Code, § 7900 et seq.).

According to the Agency's addendum report dated April 11, the parents were each visiting with P.V., and a few visits occurred with all three children present. Infant P.V. was too young to interact with her toddler siblings, and on more than one occasion, the older girls fought with each other, ran around, and were generally "not gentle enough" toward P.V.

In April, the juvenile court confirmed P.V.'s dependency and continued her placement in foster care. Further, the court bypassed reunification services and set a section 366.26 hearing in August.

In May, the court held a combined hearing for the siblings and P.V. The Agency reported that the siblings remained placed with Yvette, and adoption by Yvette would be the siblings' recommended permanent plan. The siblings were doing well but each required certain developmental services, e.g., occupational therapy, behavior therapy, and/or speech therapy. Further, Yvette was working to update her RFA to include P.V., having apparently "changed her mind" about wanting P.V. placed with her. Yvette was initially resistant to a psychological evaluation required by the Agency, but she now had one scheduled at month end.

---

[4] Brian also goes by "Christian."

Cousin and her husband were completing the requirements for foster licensing in Minnesota and were eager to begin visits with the children.

P.V. was doing very well as the only child in the care of Brian and Lisa, who were interested in adopting P.V. as well as her sisters if needed. The caregivers took P.V. to Marie's birthday party in Yvette's home and inquired of the Agency about sibling visits. Up until then, P.V. sometimes saw her siblings in the context of parental visits.[5] The Agency encouraged the caregivers to coordinate sibling visits directly with Yvette.

In August, the parties appeared for P.V.'s section 366.26 hearing, which the court proceeded to set out for a contested hearing. The Agency's section 366.26 report, filed prior to the hearing date, assessed P.V. as adoptable, observed she did not recognize her parents and had no bond with her siblings, and recommended terminating parental rights. Regarding placement and adoption, the Agency noted three "strong viable choices" for P.V. and discussed various considerations at that point in time. Yvette and Cousin were not yet approved for placement,[6] but if they were, Yvette could unite the sibling group while Cousin was a relative. Brian and Lisa were providing

---

[5] Although P.V. should have seen her sisters on a weekly basis during parent visits, the parents frequently canceled or "no showed," resulting in P.V. having much less than weekly contact with her siblings. During visits that did occur, the Agency noted that P.V., and even her siblings to an extent, did not fully understand the nature of their relationship with one another.

[6] Yvette was approved for P.V.'s placement under the RFA process on or soon after the hearing date, *after* the Agency already filed its report. As part of its RFA process, the Agency received Yvette's completed psychological evaluation and cleared several child welfare referrals involving the siblings as "unfounded."

6

excellent care for P.V. but were neither related to her by blood nor the siblings' caregivers.

Brian and Lisa filed caregiver information forms to apprise the court about P.V. The caregivers reported that Cousin had engaged in several Skype calls with P.V., Cousin had an extensive family network, and the caregivers supported P.V.'s (and her siblings') placement with relatives despite being sad at the thought of P.V. leaving them. The caregivers respected P.V.'s connection to her biological family members.

The caregivers further recommended against changing P.V.'s placement prior to a final decision on her permanent plan. Brian and Lisa noted that P.V. initially entered their home showing "significant trauma as evidenced by extreme dysregulation, high irritability, extreme sleep difficulties, flat affect, eye gaze aversion and [stiffness] in her arms and legs," which they were managing through extensive efforts and providing P.V. with "comfort and stability." The caregivers were trying to prevent her from suffering any unnecessary harm.

In early September 2019, the caregivers filed a de facto parent request.[7] Yvette filed a section 388 petition requesting placement of P.V. It was essentially undisputed there had been a change of circumstances given that Yvette had gained approval to care for all three children. Yvette argued it was in P.V.'s best interest to be placed with her siblings so they could learn social skills and develop a strong sibling bond.

As of mid-September, the Agency's recommendation for P.V. was her placement with Cousin, who had been approved to adopt all three children

_____

[7] A hearing on the de facto parent request was indefinitely deferred until the caregivers were ultimately designated P.V.'s prospective adoptive parents.

under the ICPC.  The Agency reported that 90 percent of P.V.'s many extended family members lived in the same area of Minnesota, and ideally, P.V. would get to know this family.  During the same timeframe, Yvette had one phone conversation with Cousin, which Yvette found off-putting.  From that point on, Yvette declined to have further communications with Cousin, stating that she did not see a reason for contact and that she had obtained enough family history from Mother.

The assigned social worker and caregivers reported that, thus far, Yvette had shown limited interest in getting to know P.V., such as interest in P.V.'s preferences, abilities, and routines.  In addition, due mostly to scheduling issues, P.V. had had only one focused "sibling visit" with her sisters to date, that is, a visit where the three children were focused on getting to know each other, facilitated by their caregivers, and away from the biological parents.  During this single sibling visit at a park, Athena began to have a "meltdown," requiring Yvette to take her back home.  Kriss stayed to complete the visit.

On the September date set for a pretrial status conference on the contested section 366.26 hearing, the Agency requested, and all parties agreed, on a continuance of the section 366.26 trial so that placement issues could be resolved first.  The court made an unopposed prima facie finding on Yvette's section 388 petition and set a December trial on the petition and section 366.26 issues.

Thereafter, minors' counsel declared a conflict as to all three children, and new counsel had to be appointed for P.V., and separately, for the siblings. The trial dates were continued again without objection, to give new counsel adequate preparation time.

8

In the last part of 2019 and continuing in 2020, P.V. experienced recurring rashes, bronchitis, illnesses, and ear infections that required many doctor visits, and finally, the surgical insertion of bilateral ear tubes. P.V.'s caregivers diligently attended to her needs.

Cousin and her spouse traveled to San Diego to visit P.V., and P.V. stayed with them in their hotel for two nights. The caregivers met Cousin in person during this visit; in contrast, Yvette declined a meeting. P.V. also continued weekly Skype visits with Cousin, facilitated by the caregivers.

Yvette and the caregivers had a difficult time coordinating their schedules for sibling visits.[8] Brian and Lisa invited Yvette and the siblings to P.V.'s birthday party. Yvette hesitated on whether she would attend, decided she would, but ultimately did not attend due to illness. With the Agency's assistance, a sibling visit occurred in late December 2019, and from then on, approximately once a month. During the December visit, P.V. did not recognize her siblings and Athena had "great difficulty regulating herself," as with the prior park visit.

The Agency filed several addendum reports describing the foregoing and other events. In its last addendum report filed March 2, 2020, the Agency changed its placement recommendation from P.V.'s out-of-state relatives to her current caregivers, discussing in significant detail the

---

[8]    The juvenile court faulted no one for these scheduling difficulties. The three adults were very busy, and sometimes illnesses would prevent a visit from happening. Lisa was a full-time pediatric occupational therapist, and Brian is an army veteran who attended full-time graduate school. Yvette was employed as a psychotherapist in the Los Angeles area though she appeared to mostly work from home, including on weekends. Everyone's schedules fluctuated, and they had their own schedules as well as the children's schedules and routines to consider.

considerations that led the Agency to believe it was in P.V.'s best interest to remain placed with Brian and Lisa for adoption.

For one year—most of P.V.'s life—she had resided with her caregivers, who demonstrated an exemplary ability to meet her needs, including her recent need for frequent medical care. The Agency expressly considered placing the siblings together in Yvette's home, but reiterated its ongoing concerns about Yvette—that she had not demonstrated much interest in getting to know P.V. personally; that Yvette already had two special needs children in her care (Athena and Marie), and the Agency believed that adding P.V. could "potentially put all of the children at some risk"; and that P.V. was strongly bonded to Brian and Lisa, especially after her bout of recent illnesses. Moreover, the caregivers lived five miles away from Yvette and intended to maintain P.V.'s sibling relationships. The caregivers had also demonstrated that they valued P.V.'s relationship with her out-of-state extended family, where in comparison, Yvette had refused contact with that family.

## Trial[9]

Trial on Yvette's section 388 petition and the section 366.26 issues occurred over three days in early March 2020. The court received in evidence numerous Agency reports, caregiver information forms, text messages, e-mail messages, the assigned social worker Lisa Olimpio's curriculum vitae, and a

_____

[9] By the time of trial, the siblings moved to intervene in P.V.'s case, requesting the opportunity to participate and present evidence on placement and adoption issues. The motion was granted.

10

picture of the girls. The court further heard testimony from the social worker, Yvette, and Brian.

The social worker testified consistently with the Agency's reports, observing that Yvette appeared to have "her hands full" with her current charges and that she was already at "full capacity" attending to two special needs children. The worker believed that adding P.V. into the mix, particularly while she was experiencing medical issues, would "push the whole household over the edge."

Through her testimony, Yvette attempted to establish her ability to care for all three children and the importance of keeping them together. She presented her view of the visitation scheduling difficulties. She "had a problem" with the Agency's request for her to undergo a psychological evaluation, but eventually agreed to it. Yvette acknowledged that P.V. was attached to her current caregivers but believed a transition plan would alleviate any detriment to P.V. from changing placements.

Caregiver Brian testified to various aspects of P.V.'s daily life. He explained why he believed it was in P.V.'s best interest to stay with him and his wife, including that P.V. was genuinely attached to them and that they were supportive of all of P.V.'s existing relationships—biological parents, siblings, and relatives. Brian testified about the visitation scheduling difficulties that had arisen due to Yvette's availability during certain weekday mornings, which conflicted with him and his wife's full-time work and school schedules; he did not fault or blame anyone for these scheduling issues. Brian thought that P.V. did not recognize Yvette but likely recognized her sisters and out-of-state relatives.

After carefully reviewing the evidence and hearing counsel's arguments, the court denied Yvette's section 388 petition, finding it in P.V.'s

11

best interest to remain placed with her current caregivers. The court emphasized that P.V. had thrived in the stable, loving care of her caregivers for over a year, finding Brian "credible in every aspect of his testimony." The court detailed the case history and basis for its decision, noting that P.V. had had little or no contact with Yvette. Although mindful of P.V.'s sibling relationships, the court discussed that P.V. "does not share common experiences with Marie and Athena and does not have a bond with them that competes with the bond she has with Brian and Lisa."

Moving on to the section 366.26 issues, the court found P.V. adoptable by clear and convincing evidence, terminated parental rights, and determined no exception to termination of parental rights applied. Regarding the sibling relationship exception, the court discussed that, from P.V.'s perspective, the benefits of adoption outweighed any negative effect from a severed sibling relationship. The court found "no reason to disbelieve the statements of the current caregivers that they want to facilitate the sibling relationship." Brian and Lisa were granted prospective adoptive parent status.

The siblings, Mother, and Father appealed the order denying Yvette's section 388 petition and the order terminating parental rights.

DISCUSSION

I.     *Section 388 Petition*

A.     *Standing to Appeal*

Preliminarily, the Agency argues the parents lack standing to appeal the juvenile court's denial of Yvette's section 388 petition. In response, Mother and Father claim they possess standing because if P.V. had been placed with Yvette, they believe the section 366.26 hearing would have been continued and the juvenile court may have chosen a permanent plan other

12

than adoption. Thus, the parents argue that a change in P.V.'s placement may have preserved their parental rights.

"Not every party has standing to appeal every appealable order. Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.] An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision." (*In re K.C.* (2011) 52 Cal.4th 231, 236 (*K.C.*).)

"A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*K.C.*, *supra*, 52 Cal.4th at p. 238; see *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1061-1062 [resolution of placement issue had potential to alter the decision to terminate parental rights]; *In re H.G.* (2006) 146 Cal.App.4th 1, 18 [child's removal from grandparents' custody could impact order terminating parental rights].)

In this case, Mother and Father possess no "legally cognizable interest" in P.V.'s placement with siblings unless reversing that order (i.e., placing P.V. with siblings) would potentially alter the decision to terminate their parental rights. (*K.C.*, *supra*, 52 Cal.4th at p. 237.)

We conclude the parents lack standing to appeal the placement order. If P.V. had been placed with the siblings in Yvette's home, there would be no basis for the parents to assert the sibling relationship exception to termination of parental rights, which was their only plausible argument for

13

maintaining parental rights.[10]  In fact, the siblings' counsel conceded at trial that if P.V. was placed with her siblings in Yvette's home, then "it would be impossible to show interference with the sibling relationship" to support the relevant exception to termination of parental rights.  (Regarding the exception, see section II, *post*.)

P.V. is adoptable, and Yvette wished to adopt her just as she was intending to adopt the siblings.  Had P.V. been placed in Yvette's home, her relationship with siblings would suffer no interference, and the court would have proceeded to terminate parental rights.  (See *In re A.K.* (2017) 12 Cal.App.5th 492, 500 [finding that father's parental rights would have been terminated even if minor had been placed with a relative].)

Nonetheless, we address the order denying Yvette's section 388 petition because it is properly raised by the siblings.

B.    *Legal Principles*

1.    *Statutory Scheme*

"Various statutes require the court to consider sibling relationships in rendering placement decisions."  (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1420 (*Luke M.*).)  "As with relative placement, placement with siblings is a legislative goal that does not create a mandatory duty.  It is a factor to be considered in making the discretionary foster care placement."  (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 642 [analyzing several statutes, including section 16002, and determining that the county had no mandatory duty to place dependent child with siblings].)

---

[10]    The parents also asserted the beneficial parental relationship exception to termination of parental rights, but that exception certainly did not apply given the parents' failure to maintain regular visitation with P.V. and lack of a cognizable parent-child relationship.

For example, under section 306.5, the "social worker shall, to the extent that it is *practical and appropriate*, place the [detained] minor together with any siblings or half-siblings who are also detained or include in the report prepared pursuant to Section 319 a statement of his or her continuing efforts to place the siblings together or why those efforts are not appropriate." (Italics added.)

Similarly, section 16002 states the legislative intent to "ensure the preservation and strengthening of the child's family ties by ensuring that when siblings have been removed from their home, . . . the siblings will be placed in foster care together, unless it has been determined that placement together is contrary to the safety or well-being of any sibling. The Legislature recognizes that in order to *ensure* the placement of a sibling group in the same foster care placement, *placement resources need to be expanded*." (§ 16002, subd. (a)(1), italics added.) The Agency is required to "make a diligent effort in all out-of-home placements of dependent children . . . including those with relatives, . . . to develop and maintain sibling relationships. If siblings are not placed together in the same home, the social worker . . . shall explain why the siblings are not placed together and what efforts he or she is making to place the siblings together . . . ." (§ 16002, subd. (b).)

Similarly, where "the court has ordered removal of the child from the physical custody of the child's parents pursuant to Section 361, the court shall consider whether there are any siblings under the court's jurisdiction, . . . the nature of the relationship between the child and their siblings, the appropriateness of developing or maintaining the sibling relationships pursuant to Section 16002, and the impact of the sibling relationships on the child's placement and planning for legal permanence."

15

(§ 361.2, subd. (j); see also § 366, subd. (a)(1)(D)(i) [directing juvenile court to consider the same matters at review hearings].)

Nevertheless, the consideration of sibling relationships cannot be done "in a vacuum." (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 597.) "[T]he underlying purpose of dependency law is to protect the welfare and best interests of the dependent child. [Citations.] Accordingly, the purpose of any dependency hearing is to determine and protect the child's best interests." (*Luke M.*, *supra*, 107 Cal.App.4th at pp. 1424-1425.)

The best interest standard considers the minor's current circumstances based on all available evidence. (*In re L.M.* (2019) 39 Cal.App.5th 898, 911.) "[T]he purpose of the best interest standard is to 'maximize a child's opportunity to develop into a stable, well-adjusted adult.' " (*Ibid.*) The court should consider the long-term nurturing and growth of the child, as well as the child's future physical, mental, and emotional needs. (*Ibid.*)

2.      *Standard of Review*

Under section 388, a person having an interest in a dependent child may petition to modify a prior order "upon grounds of change of circumstance or new evidence." (§ 388, subd. (a)(1); see Cal. Rules of Court, rule 5.570(a).)

At a hearing on a section 388 petition seeking to change a child's placement, the moving party must show a change of circumstances or new evidence and that a change in placement is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

We review the juvenile court's ruling on a section 388 petition for abuse of discretion. (*Stephanie M., supra,* 7 Cal.4th at p. 318.) Reversal is appropriate only if we find the court has made an arbitrary, capricious or "patently absurd" determination. (*Ibid.*) We do not inquire whether substantial evidence would have supported a different order, nor do we

16

reweigh the evidence and substitute our judgment for that of the lower court. (*Id*. at pp. 318-319.) We ask only whether the court abused its discretion with respect to the order it actually made. (*In re M.H*. (2018) 21 Cal.App.5th 1296, 1305 ["The trial court's determination that the proposed change in placement was not in the child's best interest will not be disturbed unless an abuse of discretion is clearly established."]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

C. *Analysis*

Applying the foregoing principles, we cannot say the court's decision was "patently absurd." The change of circumstances is undisputed. The court found, however, an insufficient showing that changing P.V.'s placement was in her best interests. The court carefully considered all relevant evidence and rendered a thoughtful decision.

The court considered that, given the passage of time, P.V. had grown securely and closely bonded to Brian and Lisa. They deeply loved her and would do anything for her. P.V. was thriving in their care, and she relied on them. Brian testified that P.V. would be "devastated" if separated from him and his wife; indeed, all testifying witnesses essentially believed that P.V. was attached to her caregivers and that she would suffer some degree of disruption, instability, or detriment from being separated from them. The court also considered Brian and Lisa's proven support for P.V.'s relationships with the siblings and extended family.

In contrast, Yvette had no relationship of consequence with P.V. Since case inception, the Agency was concerned that Yvette had her "hands full" with four young children already in her care and, for whatever reason, had

17

shown limited interest in getting to know P.V. personally.[11] Furthermore, Yvette was reluctant to interact with P.V.'s extended family.

On reply, the siblings assert that P.V. will suffer "long-term devastation" from having her sibling relationships severed. There is not a shred of evidence to support this assertion, and as we discuss *post*, substantial evidence supports that the relationships will continue.

Consistent with the law, the court considered P.V.'s sibling relationships in deciding her placement. The court noted that P.V. "does not have a bond with [the siblings] that competes with the bond she has with Brian and Lisa" and, regardless, the caregivers valued biological relationships and lived only a few miles away from Yvette. In totality, the court found that Yvette had not demonstrated it was in P.V.'s best interest to change placements. This was not an abuse of discretion. (*In re M.H.*, *supra*, 21 Cal.App.5th at pp. 1305-1306 [juvenile court faced with two good placement options did not abuse its discretion in selecting one].)

II.    *Sibling Relationship Exception to Termination of Parental Rights*

Mother, joined by Father, argues the juvenile court erred in not applying the sibling relationship exception to termination of parental rights. We do not find merit in the parents' position.

---

11    Mother complains of the Agency's RFA process and questions why the Agency did not place P.V. with Yvette on a temporary emergency basis. As we have discussed, Mother lacks standing to raise these issues. In any event, the record indicates why P.V. was not placed with Yvette on an emergency basis at various points in time, including that P.V. needed a concurrent home (not a temporary placement); she was placed in a concurrent home as of March 1, 2019; and for the latter part of the case, the Agency was recommending P.V.'s placement with approved relatives and awaiting a court decision on the matter. P.V.'s placement with her caregivers also should not have prevented Yvette from getting to know P.V., as exemplified by Cousin.

A.     *Legal Principles*

If a juvenile court finds that a child is likely to be adopted, adoption must be ordered unless there is a "compelling reason" to apply one of the statutorily enumerated exceptions.  (§ 366.26, subd. (c)(1)(B).)  One of the specified exceptions is the sibling relationship exception, which applies where, "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."  (§ 366.26, subd. (c)(1)(B)(v).)

Employing a two-step process, the juvenile court first determines whether terminating parental rights would substantially interfere with the sibling relationship.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 (*L.Y.L.*).)  If this first requirement is met, "the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption."  (*Ibid.*; § 366.26, subd. (c)(1)(B)(v).)  "[E]ven if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 61 (*Celine R.*).)

The parent opposing adoption has the burden of proving the statutory exception for sibling relationships applies.  (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813 (*Daniel H.*).)  This is considered "a heavy burden."

19

(*Ibid.*) The authors of the legislation adding the sibling relationship exception envisioned that its applicability would " 'likely be rare,' " meaning "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 950.) The sibling relationship exception is "evaluated from the perspective of the child who is being considered for adoption, not the perspective of that child's siblings." (*In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)[12]

We review the court's factual findings underlying the sibling relationship exception for substantial evidence and the court's weighing of competing interests for an abuse of discretion. (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437-438 (*Isaiah S.*); *D.O., supra,* 247 Cal.App.4th at p. 174.)[13]

B. *Analysis*

1. *Substantial Interference With Sibling Relationship*

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that

[12] If the court finds that the sibling relationship exception applies, it must select legal guardianship or long-term foster care rather than adoption. (§ 366.26, subd. (c)(4)(A).)

[13] The question of what standard of appellate review applies to another statutory exception to adoption (the beneficial parental relationship exception) is currently pending before our Supreme Court. (*In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.) Under either the substantial evidence or abuse of discretion standards of review, we would conclude the juvenile court did not err in declining to apply the sibling relationship exception in the circumstances of this case.

relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.)

In this case, substantial evidence supports the trial court's conclusion that the sibling relationship exception does not apply. The record supports both (1) a finding that there would be no interference with the siblings' relationship, and (2) a finding that P.V. would not suffer detriment if her relationship with the siblings ended.

First, there is substantial evidence in the record to support a finding that terminating the parents' rights and ordering adoption would not substantially interfere with P.V.'s sibling relationships. The juvenile court found Brian's testimony "credible in every aspect," and, while not dispositive, that P.V.'s caregivers intended to facilitate her existing relationship with siblings. This is an appropriate factor for the juvenile court to consider in analyzing the sibling relationship exception. (See, e.g., *D.O.*, *supra*, 247 Cal.App.4th at p. 175 [juvenile court may consider assurances of continued sibling visits in determining whether there will be substantial interference with a sibling relationship]; *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1019 [there was "no evidence that the relationships between any of the siblings will necessarily cease upon termination of parental rights," where prospective adoptive parents were willing to allow siblings to continue their relationship].) There was evidence from the social worker, Brian, and even Yvette that sibling visits would continue. The juvenile court could properly credit this evidence and reject Mother's assertion that the caregivers were making "hollow promises."[14]

---

[14]    Mother argues that the foster parents did little or nothing to cooperate with Yvette in arranging sibling visitation. That is not a fair inference from

Second, there is no substantial evidence of a bond between the children or that P.V. would suffer detriment on terminating her sibling relationships. (See *L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.) P.V. was about 15 months old at the time of hearing. She had never lived with her sisters and was too young to have meaningful interactions with them. They did not share common interests or have an emotional connection. P.V. thrived in the home of her caregivers, apart from her siblings. The parties agree that ongoing contact between the siblings is beneficial, and visits are expected to continue. The evidence amply supports a finding that P.V. would not suffer detriment from severing her sibling relationships. (*Ibid.*)

Mother points to some evidence in the record of a bond between P.V. and the siblings. On appeal, however, we review the record to determine whether substantial evidence supports the juvenile court's ruling, not Mother's position. In any event, the evidence Mother references shows the *siblings'* perspective, that is, the siblings may have had a greater awareness and fondness for their baby sister. However, in analyzing the sibling relationship exception, our focus is on the benefits and burdens to the adoptive child, not the siblings. (*Celine R.*, *supra*, 31 Cal.4th at p. 54.) We reject Mother's arguments based on this record.

2.      *Benefits of Adoption Versus Maintaining Sibling Relationship*

We further conclude the court did not abuse its discretion in finding that the benefits of adoption outweighed the benefits of P.V.'s sibling relationships.

---

the record, and in any event, the court believed Brian's testimony regarding his and his wife's efforts to arrange visitation. We do not make credibility determinations or reweigh evidence on appeal.

The purpose of the sibling relationship exception is to "preserv[e] long-standing relationships between siblings which serve as anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404 [sibling relationship exception did not apply for child removed as a newborn].)  Here, the siblings never served as "anchors" for P.V.  They were removed before P.V. was born, and the children were not raised together.  All three girls are young and egocentric.  Due mostly to her age and circumstances of removal, P.V. relied almost entirely on her prospective adoptive parents to meet her emotional and other needs.

The court considered P.V.'s need for stability and permanence.  She came to Brian and Lisa with certain developmental concerns.  In the caregivers' home, P.V. achieved her milestones and overcame challenging medical issues.  P.V. grew strongly attached to Brian and Lisa, who have shown they prioritize P.V.'s interests.  The caregivers were also supportive of P.V.'s existing relationships with her extended family.  The court could reasonably conclude that P.V.'s well-being was better served by the permanency of adoption rather than ongoing sibling contact.

Mother argues that the three children had positive, healthy interactions.  This is relevant but fails to establish that the court abused its discretion when it weighed this factor against the benefits of adoption.  (See *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293 ["[A]lthough the [child] clearly enjoyed the time she spent with her half siblings, there was no evidence that the detriment she might suffer if visits ceased presented a sufficiently compelling reason to forgo the stability and permanence of adoption by caretakers to whom she was closely bonded."].)

Mother further faults the Agency for "irregular visitation" between P.V. and the siblings.  The juvenile court, however, was unwilling to blame the

23

Agency, finding it committed "no error." We agree with this assessment. In the beginning of the case, neither Yvette nor Mother wanted P.V.'s placement with Yvette. The Agency understandably looked elsewhere, considering placement of all three children out of state, with relatives. Furthermore, when Yvette changed her mind about placement, she still needed an RFA update. The children were seeing each other during parent visits. The social worker explained that she communicated her expectation to the respective caregivers, who are competent adults, to coordinate their schedules for sibling visits, and that when they needed her help, she stepped in. Yvette and the caregivers were in fact contacting each other to try and schedule sibling visits but were hindered by their conflicting schedules and sometimes, an adult's or child's illness. The social worker did not behave irresponsibly.

To summarize, given the limited nature and strength of the sibling bond between P.V. and the siblings, the juvenile court had substantial evidence to support its finding that their relationship was not so significant that its loss would be detrimental, and the court did not abuse its discretion in determining that the benefits to P.V. of adoption outweighed any bond she might have with the siblings. This was not an appropriate case for application of the statutory exception. (§ 366.26, subd. (c)(1)(B).)

## DISPOSITION

The orders are affirmed.

BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


GUERRERO, J.